JOYCE F. YOUNGHANS v. CITY OF ST. PAUL.

222 N. W. 2d 100.

September 27, 1974—No. 44301.

*Kenneth J. Fitzpatrick,* City Attorney, and *Paul F. McCloskey, Jr.,* Assistant City Attorney, for relator.

*Salland & Faricy* and *Robert E. Faricy,* for respondent.

PER CURIAM.

Employer seeks a review of a decision of the Workmen's Compensation Commission awarding benefits to respondent, widow of the deceased employee. The only issue is whether employee, a St. Paul police officer, met his death during and in the course of his employment. We remand for further proceedings.

The decision of the compensation judge and the Workmen's Compensation Commission is based on the testimony of a witness whose version of the facts is completely discredited in all major respects by her testimony in the prosecution of Luther William Fulford whose conviction of murder in causing the death of the employee we affirmed in State v. Fulford, 290 Minn. 236, 187 N. W. 2d 270 (1971). For reasons which are beyond comprehension, the city failed to impeach the testimony of the principal witness who may have perjured herself by testifying inconsistently in the murder trial and the compensation hearing. Accordingly, in the interest of justice, the matter must be remanded for further consideration by the commission in the light of the testimony which was not considered.

The critical evidence on which the compensation judge and the commission based their decisions was this: Paulette F. Garvie, also known as Pat Nordstrom, was living in the Glendale Apartments. Luther Fulford and others had been in and out of her room at the Glendale, drinking with her most of the day of February 3, 1969. At some point, Fulford accused her of stealing $20 from him and held a knife to her throat until she apparently convinced him she hadn't taken the money. At the compensation hearing, she testified that she was frightened, that she barricaded her door against his return, and that she was very upset. When she finally left her apartment about 7 o'clock that evening, Fulford came "charging out of his apartment, come running with his knife in his hand. So David and I just split, got out of there." She said she and her companion ran down to Wabasha Street. Miss Garvie met Officer Younghans at Geraldo's Bar between 11:30 and midnight. She had not seen him at any other time that evening. She testified that she

did not call the police about her trouble with Fulford because she herself was in an illegal profession but trusted Younghans. When asked whether Younghans was drunk when she talked to him, she said: "To me Dick was perfect. I'd—I seen him, I talked to him. To me, to my eyesight and my knowledge, he looked fine to me." She said he was not drunk. She related to him the experience she had had with Fulford that day, and asked him "if he'd take a check up there [at the Glendale] and see what's going on." This all occurred just before midnight, she testified.

She twice testified she had not seen Younghans that evening until just before midnight. She stated that he was very seldom in the Glendale.

"Q. And did you see him in the Glendale Apartments quite often?
"A. No.
"Q. You didn't?
"A. No.
"Q. During the course of the days did you ever know that he was in the Glendale Apartments?
"A. No."

Miss Garvie remained in the bar with Younghans until closing time. Younghans before leaving the bar said he would "check it out." At 1 a.m., he was found dead at the Glendale Apartments.

Although Younghans had not been working for several days and was not on duty, the commission found that he was acting in the line of duty when killed. These conclusions are predicated on the following assumptions: First, that Miss Garvie was so frightened by Fulford that she turned to Younghans for help; second, that Younghans was so dedicated to duty he responded promptly, acting in his capacity as a police officer; and, third, that his only purpose in being at the Glendale was to find Fulford and restrain him from further disturbance.

As to the first assumption, bearing in mind that Miss Garvie's testimony at the compensation hearing was adduced on September 20, 1972, she previously testified in May, 1969, at the murder trial, as follows: The incident which resulted in Fulford's threatening her with a knife occurred at 10 or 10:30 on the morning of February 3. Later that morning, Fulford came back to her apartment and she let him in. When she was asked, "After that incident in the morning were you afraid of the defendant [Fulford]?" she answered, "If I would have been afraid I wouldn't have let him in the second time." When she and a companion finally left her apartment at 7 o'clock that evening, Fulford emerged from his room and Miss Garvie's companion started to run.

However, she said she "walked out of the building and nothing even happened. Luther didn't chase us or nothin."

This testimony given almost 3½ years before the compensation commission hearing completely contradicts Miss Garvie's position at the compensation commission that she sought help from Younghans because she was frightened of Fulford.

The second assumption on which the decision is based was the testimony of Miss Garvie that she complained to Younghans about midnight and within the hour he was murdered while responding to her appeal for help. In the compensation hearing she testified she had gone to a motion picture after leaving her apartment, and she left the theater between 10 and 10:30 to go to Geraldo's Bar where she met Younghans between 11:30 and 12. At the murder trial she testified on at least six different occasions that she saw Younghans at 8 o'clock in the evening and at no other time and that her conversation with him occurred at 8 o'clock. She was asked:

"Q.  Did you after 8:00 o'clock or after that first conversation you had with him?

"A.  Pardon—did I see him again?

"Q.  Yes.

"A.  No.

*  *  *  *  *

"Q.  You have indicated already that you didn't see him after 8:00 o'clock again after you had conversation with him, is that correct?

"A.  No, I did not."

Younghans wanted to buy her a drink but she declined because she wanted to go to a movie.

At the commission hearing Miss Garvie was asked whether in her opinion Younghans was drunk at the time of her conversation with him, to which she responded:

"A.  To me Dick was perfect. I'd—I seen him, and I talked to him. To me, to my eyesight and my knowledge, he looked fine to me.

"Q.  And was he drunk?

"A.  No."

At the murder trial, on the other hand, when asked whether he appeared to have been drinking heavily, Miss Garvie stated:

"All right. Like I said, I knew Dick for a year and he was starting to hit the juice pretty good when he got off duty."

She was further asked whether Younghans had consumed a considerable amount by 8 o'clock and answered, "He had quite a few."

The commission did have before it the testimony of Officer Fred Leske who was making his rounds in line of duty and ran into Younghans at midnight. He described Officer Younghans as follows:

"A. I believe he was too intoxicated to know what was going on.

* * * * *

"A. Well, his speech was slurred. It was hard to understand and he staggered when he walked. I didn't know if he was going to fall down the next step or not, and when he was in that condition he was belligerent and I tried to keep away from him as much as I could."

It is this officer in this condition that the commission holds was acting in line of duty when he was found stabbed in the Glendale Apartments.

The third assumption on which the decision of the commission is based is that the only purpose Younghans had in going to the Glendale was in performance of his duties and that he was not pursuing his own pleasure. The testimony in the murder trial refutes this assumption. In the first place, Fulford and Younghans were both in the Schubert Bar that night, and although the bartender couldn't be sure that either knew the other was there, he testified that they were in the bar at the same time for a period of approximately 15 minutes. None of this testimony was developed at the compensation hearing although it was of critical importance since there was no reason whatever for Younghans to go to the Glendale to admonish Fulford if he were aware of Fulford's presence in the bar 15 or 20 minutes before his subsequent encounter at the Glendale. There would have been ample opportunity to take up Miss Garvie's complaint without waiting for Fulford to leave.

More important, however, was the testimony of Miss Garvie at the compensation hearing to the effect that Younghans rarely was in the Glendale prior to his death. She said he was there "very seldom." She was asked at the compensation hearing:

"Q. And did you see him in the Glendale Apartments quite often?

"A. No.

"Q. You didn't?

"A. No.

"Q. During the course of the days did you ever know that he was in the Glendale Apartments?

"A. No."

This testimony was, of course, designed to show that Younghans had no other business at the Glendale except to assist Miss Garvie. However, at the murder trial she testified as follows:

"Q. And when you had seen him [Younghans] at the Glendale was he on duty at this time or off duty?

*   *   *   *   *

"A. It was times he was and there were numerous times he was off.

"Q. And when you saw him at the Glendale where did you usually see him—at what location in the Glendale Apartment building?

"A. By the desk—around by the desk.

"Q. And what was he doing at the time that you saw him there at the desk?

*   *   *   *   *

"Q. When was the last time that you saw him at the Glendale Apartments?

"A. That I couldn't say on what day.

"Q. Well, could you give us an approximate time three weeks before his death or four weeks?

"A. I have seen him—Dick almost every day.

"Q. Almost every day?

"A. Almost every day or every other day. Sometimes I see him in the building or sometimes in the bar or in the building. I couldn't pinpoint where I had seen him.

"Q. The last time that you saw him in the Glendale Apartments do you recall approximately how long ago that was before his death?

"A. I seen him on numerous occasions, I couldn't maybe—probably it was two or three weeks before.

"Q. About two or three weeks before his death?

"A. Probably.

"Q. And what was he doing at the time that you saw him?

"A. Well he usually got off duty at 4:30 or so or 5:00 so it was at night.

"Q. And it was at night—what do you recall seeing him do at the Glendale Apartments?

"A. Nothing, just loafin around probably going up there and have a few beers or something."

Two witnesses at the murder trial, Paul Books and Raymond Blumhoefer, testified that on the night he was murdered one of Younghans' purposes in being at the Glendale was to find a room for a friend. The city called neither witness at the compensation hearing. Books testified as follows:

"A. Well, a fellow come in the door with Younghans—one was to rent a room.

"Q. Another fellow came in with Younghans?

"A. He wanted to rent a room and he was talking to me about rent on the room.

"Q. He came in behind Younghans then?

"A. Yeah."

Blumhoefer testified as follows:

"Q. Did the victim himself attempt to rent a room at all that you know?

"A. No, he didn't.

"Q. He just wanted it for his friend?

"A. Yeah.

\* \* \* \* \*

"Q. But it was the victim who was attempting to rent this room for him, wasn't it?

"A. Right."

The decision of the commission should not stand without affording it an opportunity to take further testimony and reconsider its disposition of the matter in the light of this inconsistent testimony.

Remanded for further proceedings.